This is a bill filed by the complainants originally against the Heating Plumbing Finance Corporation to restrain the defendant from proceeding with an action at law, in *Page 248 
replevin, in which the defendant was attempting to recover posesssion of a heating system consisting of a steam boiler, radiators and connecting pipes under and by virtue of the terms of a conditional sales agreement. At the suggestion of, I think, Vice-Chancellor Fallon, and before the matter was referred to me, the defendant Englewood Garten-Haus, the lessee of the premises wherein the heating system is now installed, was brought in and added as party defendant.
Before going into the facts as testified by the various witnesses I desire to outline the transfers in the title to the property in question because they have some significance in the case.
In April of 1929, the Palisades Real Estate Company, then owners of the plot of which the property in question is a portion, gave to Pelligrino Sellitto and Guiseppe Cianfrone, the complainants herein, a first mortgage of $100,000, which mortgage was duly recorded in the Bergen county clerk's office, and at the trial was offered in evidence and received by me as ExhibitC-1.
Thereafter in May of 1931, the A.G. Manpe Company, the owner of the property in question at the time of the installation of the heating plant sought to be removed, gave to the Palisades Real Estate Company a mortgage in the sum of $8,000, which mortgage was duly recorded and was offered in evidence and received by me as Exhibit C-2. This mortgage, among other things, provides:
"The party of the first part agrees to begin to erect upon the above described premises immediately upon delivery to it of a certain deed, and of delivery by it of this mortgage, a building to cost at least $8,000, for the conduct of a cafeteria and restaurant, and to proceed to complete the same promptly and without delay, all at the expense of the party of the first part, and the plans for which building shall first be approved by the party of the second part; and the party of the first part also agrees to clear the plot on which this building will be erected at its own cost and expense."
The deed referred to in the mortgage was not offered in evidence, but since the mortgage was given and the building constructed, I may safely presume that it was delivered. *Page 249 
Thereafter by an assignment dated February 17th, 1932, the Palisades Real Estate Company assigned its interest in the mortgage just referred to (Exhibit C-2), to Antonio Sellitto, and this assignment was offered in evidence and received by me asExhibit C-3.
On February 12th, 1932, Antonio Sellitto, the assignee named in the assignment referred to as C-3, purchased the property in question at a sheriff's foreclosure sale, and took a deed from Harold V. Reilly, sheriff of Bergen county. This is in evidence as Exhibit C-4.
Thereafter, by a bargain and sale deed, the grantee in the sheriff's deed, Antonio Sellitto, and his wife, on the 1st of October, 1932, conveyed their interest to the complainants herein, the mortgagees in the first mortgage of $100,000 which isC-1 before me, and this bargain and sale deed is Exhibit C-5
in evidence before me.
Two days after the giving of the bargain and sale deed above referred to, the grantors, Antonio Sellitto and Filomena Sellitto, his wife, executed a lease of the property in question to the third party defendant, Englewood Garten-Haus, and this lease is also in evidence before me as Exhibit C-6.
The facts produced at the trial by the witnesses show that on or about the first day of May, 1931, in pursuance of the agreement recited in the mortgage known as C-2, construction work was started on the building which has been referred to throughout the trial as the Englewood Garten-Haus, and in order to get it in shape for the summer's road-stand business, work was rushed and the building was completed and opened for business some time in June or July of that same year. The testimony was conflicting as to whether or not anything remained to be done on the building that was intended to be done by the owner, but I cannot read his intention further than the fact that the building was thrown open to the public for the carrying on of business. Some time after Labor Day, after the summer business was beginning to wane, the then owners, the A.G. Manpe Company, in contemplation of fall and winter business, let *Page 250 
a contract for the installation of a heating system. The exact date upon which the work was commenced was not testified to by any of the witnesses, but the conditional sales contract under which the installation was made is dated the 8th day of October, 1931, and on the 24th of November, 1931, the A.G. Manpe Company delivered to the contractor the following writing:
"To whom it may concern: We hereby certify that we have today issued to John W. Dutcher a note for $3,097 representing the balance due for labor and materials which the aforesaid dealer has delivered and installed in our premises in a satisfactory manner, and acceptance of such note does not waive lien rights, if any."
This paper is Exhibit D-4 in evidence before me, and indicates a completion of the work. I gathered that the original intention of the owners, because of the fact that the building rested on solid rock in the region of the Palisades, was to erect the steam boiler on the main floor of the building, on a concrete base, but the engineers of the American Radiator Company, after making a preliminary survey, voiced the opinion that this would be impractical, and it was thereupon decided to erect the boiler in a pit under the floor, the building having no cellar, access to which would be gained by means of a trapdoor in the floor. In order to facilitate the work of installation, a hole was opened in the main floor of the building and workmen came in with compressed air hammers and drilled the rock below and by means of dynamite charges blasted out a so-called "pit." The testimony disclosed that at the time of these operations mats of wood and chain were placed over the rock being blasted to prevent flying particles of stone doing damage to the structure of the building.
When the pit had been made sufficiently large, it was lined with concrete to prevent water seepage into the area of the firebox of the boiler and it was then lowered by means of a block and fall, piece by piece, into the pit where it was assembled into the present boiler. The testimony was conflicting as to the size of the hole cut in the floor to do this operation, and also as to whether or not plaster was removed from the *Page 251 
ceiling of the room, in order to attach the block and fall which lowered the sections of the boiler into the pit to the second floor rafters, but this, to my mind at the present time, is immaterial.
Feed lines were then run under the floor of the building, holes cut in the floor to allow the risers to be connected to the feed lines in the under part of the building and the radiators at various points throughout the building, and eventually the work was completed. Thereupon a steel plate, or trapdoor, was put over the hole in the floor to give access to the pit below and this door was fastened to a framework, or sash, and resembled, to my notion, the steel doors found in sidewalks giving access to basements under stores and other business property.
The testimony further disclosed that after the complete installation some of the risers were left exposed in order to produce a greater amount of radiation, and in some of the living rooms upstairs lath and plaster were put upon the walls concealing the pipes.
Thereafter on the 24th of November, as previously indicated, a note was given to the contractor in the sum of $3,097 and still later on the 13th of January, 1932, the conditional sales agreement was recorded. This note and the conditional sales agreement were on August 19th, 1932, negotiated and assigned to the present defendant, Heating Plumbing Finance Corporation, by the holder-contractor, Dutcher. This assignment was recorded in the Bergen county clerk's office on November 23d 1932.
The vendees quite apparently had trouble meeting the payments under the conditional sales agreement from the start and the testimony clearly indicates that they promised to turn over to Dutcher as a payment their receipts which they expected to be forthcoming on Thanksgiving Day immediately following the completion of the work, but for some reason not explained the receipts did not materialize and the payment of any sum was postponed until New Year's, at which time they expected to reap a rich harvest, and again their expectations seem to have vanished in the thin air. At any rate, no payments on account of the note were made, *Page 252 
and eventually a suit was instituted in the law courts to recover possession of the heating apparatus through a replevin action. Just when demand was made for either payment or delivery of the heating plant for the first time it is difficult to say. The complainants say no demand was made until sometime in December, 1932, but correspondence introduced in evidence before me as an exhibit, and marked D-5, indicates that on April 28th, 1932, Burke, Sheridan Hourigan, complainants' solicitors, wrote to defendants with respect to the case and the witness for the defendant who produced this letter says that he made demand for payment as early as April, 19th, 1932, and I conclude therefore it was some time in the month of April.
Shortly after institution of the law action, the present complainants, who derive their title as shown before by reason of a sheriff's deed, relying on some of the decisions of our courts which they concluded were applicable, filed a bill in this court to restrain the law action permanently and prevent the removal of this heating system on the ground that it would permanently and irreparably injure the premises. In this contention I cannot hold with the complainants, because the undisputed testimony of the defendants' experts shows that they could, without any great fuss or disturbance, remove all of the parts of the system and leave only the holes in the floor through which ran the risers or feed pipes. They explain that in order to do this it is only necessary to enter the pit by means of the trap door provided; dismantle the boiler in the pit, and remove it section by section through the trap door. They propose to do this in either one of two ways; first, by the use of man power alone, and second, by means of a snatchblock mounted on a tripod which could stand on the main floor of the building. The main steam lines under the building, they say, could be readily taken out through the pit hole or the side walls surrounding the open space under the building, and the risers, once loosened from the feed lines, would be easily removable even though located as they are, in some instances, behind plaster which was set up after they were. The radiators, of course, could be removed with little or no trouble. *Page 253 
I find that the complainants, purchasers at the sheriff's sale, had notice by reason of the filing of the conditional sales contract of its existence, and took subject to the defendant's rights under it.
It may be noted that in the case of Reliable Building and LoanAssociation v. Purifoy, 111 N.J. Eq. 575, involving the same state of facts as the case at bar, the court held that the heating system was removable without material injury to the freehold.
I find in the present case no material or permanent injury will be done to the premises, and the defendant has voiced its willingness to repair any damage occasioned by its workmen in the careless use of tools, scratching floors or walls, or doing other damage which they say will be only nominal.
The conditional sales agreement specifically recites, "this property shall always be treated as personalty." This is the agreement between the owner, the purchaser in the first instance, and the man who sold it. Between them there can be no question at all that the property could be taken out by the conditional vendor at any time, and the complainants, having purchased at a foreclosure sale, can have no stronger rights than the original owner.
As to the lessee, it is very important to him to have this heating plant, and doubtless he would not have engaged in this rental agreement if he had known there was such a delicate string holding this heating plant in his place of business. He said on the stand that he didn't know anyone claimed any interest in it. He had notice as the conditional sales agreement was on file, and while I agree that he was properly brought in and made a party to the suit, his remedy, if at all, is against his landlord.
I will advise a decree dismissing the bill; vacating the injunction and restraint heretofore secured by the complainants against the defendant, Heating Plumbing Finance Corporation et al., by order dated January 16th, 1933; and granting unto the defendant, Heating Plumbing Finance Corporation, the relief prayed for in its counter-claim filed herein against the complainants and the third party defendant, Englewood Garten-Haus, a corporation. *Page 254